IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| WIRELESS ADVANCE VEHICLE ELECTRIFICATION, LLC, a Delaware limited liability company,<br><br>　　　　Plaintiff,<br><br>v.<br><br>WITRICITY CORPORATION, a Delaware corporation; JOE BENZ, an individual; JUSTIN SCALZI, an individual; STEVEN BALL, an individual; ROBERT EISERT, an individual; PRADEEP GADDAM, an individual; GARRETT HARMSEN, an individual; JORY PEPPELAAR, an individual; WYLEE STAPLES, an individual; GAYLA STEWART, an individual; ADEEL ZAHEER, an individual; RUBEN GOMEZ, an individual; GLEN AGUILAR, an individual; JEFFREY HARDING, an individual; JUSTIN NORDLUND, an individual; and MELANIE ESPINOSA, an individual,<br><br>　　　　Defendants. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>2:24-cv-00577-RJS-CMR<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

Before the court is Plaintiff Wireless Advanced Vehicle Electrification's (WAVE) Motion for a Temporary Restraining Order (TRO) and Preliminary Injunction.[1]  As explained in more detail below, the Motion is GRANTED IN PART and DENIED IN PART.

In its Motion, WAVE seeks to enjoin:

1.   Defendants WiTricity, its officers Edward Benz and Justin Scalzi, and WAVE's

former employees, Glenn Aguilar, Steven Ball, Robert Eisert, Pradeep Gaddam,

---

[1] Dkt. 4, *Redacted Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction* (*TRO Motion*).

Ruben Gomez, Jeffrey Harding, Garrett Harmsen, Justin Nordlund, Jory
Peppelaar, Wylee Staples, Gayla Stewart, and Adeel Zaheer from possessing and
using WAVE's confidential and trade secret information; and

2. Ball, Eisert, Melanie Espinosa, Gaddam, Gomez, Harmsen, Peppelaar, Staples,
Stewart, and Zaheer from working for WiTricity in violation of their non-compete
agreements with WAVE.

At the hearing on the TRO Motion on August 26, 2024, the parties agreed to entry of a
stipulated preliminary injunction against Aguilar, Ball, Eisert, Gaddam, Gomez, Harding,
Harmsen, Nordlund, Peppelaar, Staples, Stewart, and Zaheer. [2]  The stipulated preliminary
injunction:

1. Prohibits Aguilar, Ball, Eisert, Gaddam, Gomez, Harding, Harmsen, Nordlund,
Peppelaar, Staples, Stewart, and Zaheer from using or disclosing WAVE's
confidential information, as defined in the confidentiality provision; and

2. Requires Aguilar, Ball, Eisert, Gaddam, Gomez, Harding, Harmsen, Nordlund,
Peppelaar, Staples, Stewart, and Zaheer to deliver any of WAVE's confidential
information in their possession to their counsel or WAVE within 48 hours.

Because the language in the stipulated preliminary injunction encompasses trade secrets,
the court denies as moot that portion of the Motion that seeks the same relief sought in reliance
on WAVE's trade secret misappropriation claims as directed to WAVE's former employees.
The court denies WAVE's Motion for a TRO to the extent WAVE seeks to enjoin WiTricity,
Benz, and Scalzi because WAVE has not shown a likelihood of success on the merits of its trade

---

[2] Dkt. 64, *Minute Entry*.

secret misappropriation claim against these defendants and these defendants are not named in the breach of contract claims.

For the reasons explained below, the court enjoins Ball, Eisert, Espinosa, Gaddam, Gomez, Harmsen, Peppelaar, Staples, Stewart, and Zaheer from working for WiTricity for one year consistent with the non-compete provisions of their WAVE employment contracts.

## FACTUAL BACKGROUND[3]

### I.   The Parties

Plaintiff WAVE is a Delaware LLC with its principal place of business in Utah.[4]  WAVE operates in the inductive charging industry, offering high-power wireless charging systems for the heavy-duty electric vehicle market.[5]  Prior to the conduct alleged in its Complaint, WAVE had seventeen employees.[6]

WAVE has spent over a hundred million dollars and thousands of hours developing its confidential and trade secret information.[7]  This includes "client contacts and contact information, technologies, processes, customer and supplier insights, pricing details, engineering specifications, tuning parameters, data insights, innovation, growth[] and product strategy, and software codes.[8]

There are two other prominent companies in the inductive charging industry besides WAVE: WiTricity and InductEV, Inc.[9]  WiTricity is a Delaware corporation with its principal

---

[3] These facts are drawn from Dkt. 3, *Verified First Amended Complaint* (*Amended Complaint*) and from the parties' TRO briefings, including attached exhibits.

[4] *Amended Complaint* ¶ 1.

[5] *Id.* ¶¶ 22–24.

[6] *Id.* ¶ 1.

[7] *Id.* ¶ 26.

[8] *Id.* ¶ 35.

[9] *Id.* ¶ 29.

place of business in Massachusetts, and it operates two locations in Utah.[10]  Benz is its CEO and Scalzi is its VP of fleets and commercial vehicles.[11]  WiTricity primarily offers low-power wireless charging systems for electric vehicles.[12]  "Over the past four years . . . WiTricity has made several attempts to purchase or acquire WAVE."[13]

The remaining Defendants are twelve former at-will employees of WAVE who now work for WiTricity: Aguilar, Ball, Eisert, Espinosa, Gaddam, Gomez, Harding, Harmsen, Nordlund, Peppelaar, Staples, Stewart, and Zaheer.[14]  While employed at WAVE, these employees participated in two involuntary furloughs.  The first ran from November 2022 to February 2023 and required employees to take one unpaid day off every ten business days.[15]  The second furlough lasted from November 2023 to June 2024 and employees were unpaid unless they were granted an exception to work.[16]  These exceptions were designed to ensure essential company functions would continue.  The former employees returned to their full-time employment at WAVE after both furloughs.

## II.     The Relevant Contract Provisions

WAVE requires all its employees to sign employment agreements containing a confidentiality provision and to review WAVE's "Employee Handbook" which includes a

---

[10] *Id.* ¶ 2.

[11] *Id.* ¶¶ 3–4.

[12] *Id.* ¶ 30; Dkt. 48, *Defendants' Brief in Opposition to Plaintiff's Request for Temporary Restraining Order* (*Opposition*) at 5.

[13] *Amended Complaint* ¶¶ 32, 34; *Opposition* at 9.

[14] *Amended Complaint* ¶¶ 5–17; Dkt. 6-3, *Declaration of Tammy Myers* at 6, 20, 43, 58, 72, 86, 100, 115, 127, 147, 161, 175, 224.

[15] Dkt. 48-18, *WAVE Furlough Policy* at 1.

[16] *See, e.g.*, Dkt. 48-3, *Declaration of Steve Ball* ¶ 6.

confidentiality section.[17]   The confidentiality provision of the employment contracts reads as follows:

> Employee acknowledges that the information, observations and data that have been or may be obtained by Employee during Employee's employment . . . of or concerning the [Company] or their businesses or affairs (collectively, "Confidential Information"), are and will be the property of the [Company] . . . . Employee agrees that Employee will not, during the Employee's employment with the Company or thereafter, disclose to any unauthorized party or use for the account of Employee or any other party . . . any Confidential Information without the prior written consent of the Company . . . . Employee will deliver or cause to be delivered to the Company upon the Termination Date or at any other time the Company or its Affliates may request, all memoranda, notes, plans, records, reports, computer tapes and software and other documents and materials (and copies thereof) containing or relating to Confidential Information or the business of any Related Company that Employee may then possess or have under Employee's control.  For purposes of this agreement, Confidential Information includes, but is not limited to, formulas, patterns, compilations, programs, devices, methods, techniques, or processes, business plans and strategies, customer lists, customer fata, information regarding employees and other service providers, marketing plans, supplier and vendor lists and cost information, software and computer programs, data processing systems and information contained therein, price lists and pricing strategies, financial data, and any other trade secrets or confidential and proprietary information, documents, reports, plans, or data, of or about the [Company].  Employee acknowledges and agrees that this Agreement is intended to protect the trade secrets of the [Company] . . . .[18]

Employees working at WAVE's headquarters in Utah with access to confidential information are required to sign employment agreements containing a one-year non-compete provision.[19]   Ten of the former employees in this case—Ball, Eisert, Espinosa, Gaddam, Gomez, Harmsen, Peppelaar, Staples, Stewart, and Zaheer—signed the non-compete,[20] which states:

> During the Employment Term and for a period of one (1) year following the Termination Date, Employee shall not . . . directly or indirectly, . . . serve as a director, officer, employee, partner, manager, consultant, advisor, agent, or independent contractor of any Person that engages in or proposes to engage in, any

---

[17] *Amended Complaint* ¶ 36.

[18] Dkt. 48-19, *Representative Employment Agreement* at 3.

[19] *Amended Complaint* ¶ 37.

[20] *TRO Motion* at 18.

business that is the same as or substantially similar to, or that materially competes with, the Business anywhere in the world . . . .[21]

The contract defines Business as:

(i) the business of developing, producing, installing, or operating wireless charging infrastructure for transit, port, industrial, commercial, and off-road electric vehicles; (ii) the business of developing, producing, installing, or operating inductive charging systems; and (iii) any other business in which the Company is engaged or contemplates engaging in at the time of, or during the twelve (12) month period prior to, the Termination Date.[22]

The employment contracts also contain provisions regarding the reasonableness of the restrictive covenants, the court's ability to enforce blue penciled covenants, written amendment of the contracts, and injunctive relief.[23]

## III.    The Conduct

"Defendants [allegedly] staged and carried out a coordinated attack on WAVE."[24]  In May 2024, Benz met Ball and two former WAVE employees at the Advanced Clean Transportation Expo, who communicated dissatisfaction with WAVE.[25]  "[F]ollowing research into whether a business case existed to expand its team, WiTricity contacted the WAVE employees around July 13, 2024" to see if they still wished to leave WAVE.[26]  Between July 17 and July 25, several WAVE employees met with WiTricity employees.[27]  WiTricity extended offers to these employees on July 24.[28]  Over three days from July 29 to July 31, twelve of

---

[21] *Representative Employment Agreement* at 4.

[22] *Id.* at 5.

[23] *Amended Complaint* ¶ 45; *Representative Employment Agreement* at 5–8.

[24] *Amended Complaint* at 2.

[25] *Opposition* at 9.

[26] *Id.*

[27] Dkt. 6-2, *Declaration of Michael Austin* ¶ 3.

[28] Dkt. 48-1, *Declaration of Edward Joseph Benz III* ¶ 31.

WAVE's seventeen employees, or seventy percent of WAVE's workforce, resigned.[29]  During their final days with WAVE, Ball, Stewart, Gaddam, Peppelaar, Staples, and Zaheer downloaded data and files from WAVE's secured Sharepoint[30] and Aguilar, Eisert, Harmsen, Nordlund, Peppelaar, Staples, and Stewart allegedly have not returned their WAVE laptops and access cards.[31]

On August 1, the former WAVE employees, other than Espinosa, began their employment with WiTricity.[32]  However, WiTricity avers it "undertook a rigorous and extraordinary process to ensure that [the former employees] were not taking any WAVE confidential information or trade secrets."[33]  WiTricity engaged counsel at Butzel Long who, on August 6, 7, 11, and 13, "took possession of all WAVE tangible devices and information" and "assisted in the collection and preservation of data from these employees" and, in some cases, "the purging of any WAVE data from their personal devices."[34]  For example, Ball provided counsel from Butzel Long with "paper files, a flashdrive, and old data storage devices."[35]

Additionally, each former WAVE employee "signed an acknowledgement attesting that [they have] no WAVE information, nor will [they] use WAVE information in the future."[36]  And WiTricity has informed the employees that it "has a zero-tolerance policy for use of confidential

---

[29] *Amended Complaint* at 2.

[30] *TRO Motion* at 6; *Declaration of Michael Austin*.  These employees have submitted declarations which state at least some of the downloads were conducted for WAVE business purposes or at the request of WAVE supervisors. *Opposition* at 13.

[31] *Amended Complaint* ¶¶ 89, 108, 117, 125, 135–36, 151, 159.  Harmsen and Staples state they left their laptops in their office desk drawers on their last day.  *Opposition* at 11.

[32] *Declaration of Edward Joseph Benz III* ¶ 32.

[33] *Opposition* at 11.

[34] *Id.* at 12.

[35] *Declaration of Steve Ball* ¶ 46.

[36] *Opposition* at 12.

or trade secret information from former employees and would terminate any employee found to be using or sharing confidential information or trade secrets of a former employer."[37]  Only on August 20, 2024, once this process was complete, did the employees receive their WiTricity computers and begin work.[38]

WAVE initiated this lawsuit on August 9, 2024,[39] and filed its application for a TRO on August 15, 2024.[40]  Following expedited briefing, the court received oral argument on August 26, 2024.[41]

## LEGAL STANDARD

A preliminary injunction or temporary restraining order is "an extraordinary remedy never awarded as of right," and accordingly, "the movant must make a clear and unequivocal showing it is entitled to such relief."[42]  Even then, the grant of such relief is "the exception rather than the rule."[43]  To obtain a preliminary injunction or a temporary restraining order, a movant must show: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) [] the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) [] the injunction, if issued, will not adversely affect the public interest."[44]

---

[37] *Id.*

[38] *Id.*

[39] Dkt. 1, *Complaint*.

[40] *TRO Motion.*

[41] *Minute Entry.*

[42] *State v. United States Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021) (internal citations and quotations omitted).

[43] *Mrs. Fields Franchising, Ltd. Liab. Co. v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (internal citations and quotations omitted).

[44] *Dine Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (citation omitted).

## ANALYSIS

### I.      Breach of the Non-Compete Provisions in the Contract

Consistent with the non-compete agreements in their employment contracts, WAVE seeks to enjoin Ball, Eisert, Espinosa, Gaddam, Gomez, Harmsen, Peppelaar, Staples, Stewart, and Zaheer from working for WiTricity for one year.  The court finds that WAVE has demonstrated each of the required elements to obtain this extraordinary relief.

#### a.  Likelihood of Success

The court finds WAVE has established a likelihood of success on the merits of its claim that ten of its former employees—Ball, Eisert, Espinosa, Gaddam, Gomez Harmsen, Peppelaar, Staples, Stewart, and Zaheer—have breached the non-compete provisions in their employment contracts.

Because the employment contracts have a Utah choice of law provision, the court applies Utah law to evaluate whether WAVE has demonstrated a likelihood of success on the merits of its breach of contract claim.[45]  Under Utah law, a breach of contract claim has four elements: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[46]

Defendants contend that WAVE cannot show a likelihood of success on the merits of its non-compete breach claim because (1) WAVE materially breached the employment contracts first by reducing its employees' compensation during two involuntary furloughs, freeing Defendants from complying with the contract terms, and (2) the scope of the non-compete is

---

[45] *See Representative Employment Agreement* at 8 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Utah (without regard to any conflicts of law principles thereof that would give effect to the laws of another jurisdiction) . . . .").

[46] *Am. West Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15.

unreasonable, rendering it unenforceable.  The court addresses each of Defendants' arguments in turn.

### i.  Material Breach

According to Defendants, "WAVE's furloughs amounted to a material breach of the employment agreements," and, because WAVE materially breached first, WAVE cannot enforce its confidentiality and noncompete provisions.[47]  "[A] party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform."[48]  Such a material breach occurs when there is "a failure of performance which defeats the very object of the contract or is of such prime importance that the contract would not have been made if default [of] that particular [term] had been contemplated[.]"[49]  And several courts outside Utah have found that material terms in an employment contract include "duration, compensation and the employee's duties."[50]

Defendants argue "WAVE's failure to pay the employees their full salaries [during the furloughs] was a material breach[,] . . . [because] [t]he employees would not have entered into the employment agreements had they known that WAVE could modify the salary terms at its

---

[47] *Opposition* at 18.

[48] *Cross v. Olsen*, 2013 UT App 135, ¶ 25, 303 P.3d 1030 (quoting *CCD, LC v. Millsap*, 2005 UT 42, ¶ 29, 116 P.3d 366).

[49] *Id.* ¶ 27 (quoting *Polyglycoat Corp. v. Holcomb*, 591 P.2d 449, 451 (Utah 1979)) (cleaned up).

[50] *Adair v. Pfizer, Inc.*, 245 F. Supp. 2d 437, 441 (D. Conn. 2003); *see also Williams v. Fed. Deposit Ins. Corp.*, No. 09-504RAJ, 2011 WL 13193362 (W.D. Wash. Aug. 30, 2011) (stating "the employees' duties, compensation and benefits, conditions for termination, confidentiality obligations, and intellectual property obligations" are material terms and conditions of employment contract); *Harper v. Mancos Sch. Dist. RE-6*, 837 F. Supp. 2d 1211, 1218 (D. Colo. 2011) (identifying the material terms of an employment contract as the "length of contract, salary, [and] benefits").  The court did not locate any Utah law discussing the material terms of an employment contract.

discretion and thereby deprive the employees 'of the benefit which [they] reasonably expected.'"[51]

To refute Defendants' assertion, WAVE cites *First American Title Insurance Co. v. Northwest Title Insurance Agency, LLC*.[52]  In *First American*, the defendants argued their employer materially breached their employment agreements by changing the defendants' compensation and employment duties.[53]  Judge David Nuffer began his analysis by recognizing that an employee's compensation and duties are material terms of an employment contract.[54] However, because the employees were at-will, "[t]he question of materiality does not need to be fully addressed."[55]  Under Utah law, "the employer can unilaterally change compensation and the employee's duties [in the at-will setting].  If the employee continues employment after those changes, the newly changed terms become part of their employment contract."[56]

Here, the evidentiary record establishes Defendants were at-will employees.[57]  And neither party disputes Defendants continued their employment through the furloughs and returned to full-time work when the furloughs ended.  Under Utah law, because Defendants continued their employment, the temporarily reduced compensation during the furloughs became part of their employment contracts.

---

[51] *Opposition* at 19–20 (quoting *Cross*, 2013 UT App 135, ¶ 28).  However, Defendants' affidavits do not contain any assertions that they would not have agreed to work for WAVE had they known about the possibility of furloughs or reduced pay.

[52] No. 2:15-cv-00229-DN, 2016 WL 6902473 (D. Utah Nov. 12, 2016).

[53] *Id.* at *14.

[54] *Id.*

[55] *Id.* at *15.

[56] *Id.* at *14 (citing *Ryan v. Dan's Food Stores Inc.*, 972 P.2d 395, 401 (Utah 1998); *Whisman v. Ford Motor Co.*, 157 Fed. App'x. 792, 800–01 (6th Cir. 2005)); *see also id.* at *16 (citing *Trembly v. Mrs. Fields Cookies*, 884 P.2d 1306 (Utah Ct. App. 1994)).

[57] *See Declaration of Tammy Myers* at 6, 20, 43, 58, 72, 86, 100, 115, 127, 147, 161, 175, 224, 240.

Defendants present no contrary authority—in Utah or elsewhere—finding that a furlough represents a material breach of an employment contract.  While Defendants cite *Van Dyke v. Liberty Press LLC* for the proposition that "the employer breached its contract by altering the pay structure 'without negotiating that change with its employees,'" that case is inapposite.[58] First, the *Liberty Press* court did not find a change in compensation was a material breach. Second, the case did not address an at-will employment contract.  Third, the *Liberty Press* court found, for those contracts where the employee "continued his work . . . under the modified pay structure without voicing any objection[,] [h]is conduct thereby manifest[ed] his tacit acceptance of the reduced commission rate."[59]  Here, Defendants similarly continued working during both furloughs and returned to full-time employment when the furloughs concluded.

As Defendants point out, Defendants' employment contracts state they "may be amended or modified only by a written instrument."[60]  By unilaterally reducing its employees' salaries, Defendants argue, WAVE breached this provision.[61]  It is not clear how the Utah Supreme Court would balance at-will employment with a written amendment provision.  However, there is robust case law in Utah allowing an oral modification of a contract even when the contract contains a provision requiring all changes to be in writing.[62]  While there was no oral

---

[58] *Opposition* at 20 (citing *Van Dyke v. Liberty Press LLC*, No. 100107272, 2013 WL 5288462, at *8 (Utah Dist. Ct. Aug. 12, 2013)).

[59] *Liberty Press*, 2013 WL 5288462, at *8.

[60] *Representative Employment Agreement* at 8.

[61] *Opposition* at 19–20.

[62] *See, e.g.*, *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 9, 40 P.3d 1119 ("Utah law clearly directs that written agreements can be orally modified even if the written agreement contains a provision to the contrary."); *id.* ¶ 13 n.4 (citing numerous Utah state cases holding the same); *Arlington Mgmt. Assoc., Inc. v. Urology Clinic of Utah Valley, LLC*, 2021 UT App 72, ¶ 17, 496 P.3d 719 ("[A] contract may be modified by an oral agreement even if, as in this case, the contract says it can be modified only in writing.").

modification of the contracts at issue here, this precedent suggests the Utah Supreme Court likely would not strictly apply a contract provision requiring all amendments to be in writing.

The court finds Judge Nuffer's analysis in *First American Title* persuasive and agrees the same outcome follows here based on the binding state court authority cited in his ruling. On this basis, the court concludes the two involuntary furloughs did not amount to material breaches of the employment contracts where the at-will Defendant employees continued their employment with WAVE following each furlough.

But even if the Utah Supreme Court announced a new rule that this result does not follow where the employment contracts permit modification only in writing, the record here at most creates a question of fact for a jury concerning whether either or both of the furloughs amounted to a material breach of the agreements.[63] The court concludes WAVE has shown a likelihood of success on its non-compete breach claim notwithstanding Defendants' asserted first material breach defense.

With respect to the first furlough, the record supports, but does not establish, that the economic effect was to reduce Defendants' salary by about ten percent for about two-and-a-half months.[64] According to the WAVE Furlough Policy submitted by Defendants, health benefits and vacation accruals were unaffected by the furlough.[65] Employer 401k contributions and bonus plans were affected in a proportional amount.[66] The court concludes it is highly unlikely on the totality of the record before it that a jury would find this a "a failure of performance which

---

[63] *Cross*, 2013 UT App 135, ¶ 28 (quoting *Orlob v. Wasatch Med. Mgmt.*, 2005 UT App 430, ¶ 26, 124 P.3d 269) ("Whether a breach of contract constitutes a material breach is a question of fact.").

[64] Dkt. 48-18, *WAVE Furlough Policy* at 1 ("North American employees will participate by taking 1 day furlough over a 2-week period between November 7th, 2022 and January 31st, 2023.").

[65] *Id.* at 2.

[66] *Id.*

defeats the very object of the contract or is of such prime importance that the contract would not have been made if [the first furlough] had been contemplated[.]"[67]

The court further finds that Defendants have failed to provide a sufficient factual basis to adequately evaluate the likelihood that a reasonable jury may find the second furlough represented a material breach.  As noted at oral argument, save for a longer term and a handful of largely non-specific facts submitted in the employee Defendants' declarations, there is virtually no information in the record concerning the actual impact of the second furlough on Defendants. Also noticeably absent from the record are any declarations from Defendants that they would not have worked for WAVE had they known they might be subjected to reduced compensation during temporary furloughs.  Without this record the court cannot access the potential strength of Defendants' material breach defense.  The court concludes that, even if it is considered, WAVE has on the record before the court shown a likelihood of overcoming Defendants' defense and prevailing on its non-compete breach of contract claim at trial.

### ii.  Scope of the Non-Compete Provision

Non-compete provisions are enforceable in Utah only when "carefully drawn to protect [] the legitimate interests of the employer."[68]  "The reasonableness of a [non-compete] depends upon several factors, including its geographical extent; the duration of the limitation; the nature of the employee's duties; and the nature of the interest which the employer seeks to protect such as trade secrets, the goodwill of his business, or an extraordinary investment in the training or education of the employee."[69]  "Utah courts avoid deciding whether a non-compete agreement is

---

[67] *Cross*, 2013 UT App 135, ¶ 27 (quoting *Polyglycoat Corp. v. Holcomb*, 591 P.2d 449, 451 (Utah 1979)) (cleaned up).

[68] *Robbins v. Finlay*, 645 P.2d 623, 627 (Utah 1982).

[69] *Id.* (citations omitted).

overly broad in its entirety.  Instead, a court will consider whether a non-compete provision is too broad as applied to the acts specified in the complaint."[70]

Defendants argue the scope of the non-compete is too broad as to the definition of a competitor, the lack of geographic restraints, and the type of future employment.  The court addresses each in turn.

### 1.  Definition of a Competitor

The employment contracts define a competitor as those in "the business of developing, producing, installing, or operating inductive charging systems."[71]  WiTricity does not dispute its low power wireless charging products are inductive charging systems.[72]  Therefore, under the plain language of the contract, WiTricity is a competitor.

At the hearing on the TRO Motion, Defendants' counsel argued this definition is too broad,[73] because "WiTricity has never offered for sale or sold a high-powered product, and WAVE has never offered for sale or sold a low-powered product."[74]  Counsel suggested that considering these products in the same market is akin to considering semi-trucks and golf carts in the same market.[75]

---

[70] *First Am. Title Ins. Co.*, 2016 WL 6902473, at *16 (citing *Bad Ass Coffee Co. of Haw. v. JH Nterprises, LLC*, 636 F. Supp. 2d 1237, 1247 (D. Utah 2009); *J & K Comput. Sys., Inc. v. Parrish*, 642 P.2d 732, 736 (Utah 1982)).

[71] *Representative Employment Agreement* at 5; *Amended Complaint* ¶ 57.

[72] *Opposition* at 5 ("[H]ighly resonant wireless power transfer . . . is the foundational technology underlying resonant-based systems for wireless charging of electric vehicles, including those offered by WiTricity and WAVE.").

[73] *Minute Entry*.

[74] *Opposition* at 8.

[75] *Minute Entry*.

However, "Utah courts avoid deciding whether a non-compete agreement is overly broad in its entirety."[76]  Unlike the motor vehicle market, only three companies belong to the industry of "developing, producing, installing, or operating inductive charging systems."[77]  As applied, the court cannot conclude that the scope of the non-compete is overly broad.

### 2.   Geographic Scope of the Non-Compete

WAVE's non-compete provision effectively bars its employees from working for "any business that is the same as or substantially similar to, or that materially competes with, [WAVE] anywhere in the world."[78]  Defendants contend that the scope of the non-compete is unreasonable because it operates as a worldwide ban.[79]

The Utah Supreme Court's decision in *System Concepts, Inc. v. Dixon* is instructive.[80]  The *Systems Concepts* court evaluated the reasonableness of System Concepts' universal non-compete in the cable television industry.[81]  In 1983, the entire market for System Concepts' product was limited to "approximately 2,500 potential customers."[82]  The Utah Supreme Court found that the lack of a geographic restriction in the non-compete was reasonable because the size of the market was "inherent[ly] limit[ed]."[83]

---

[76] *First American Title Ins. Co.*, 2016 WL 6902473, at *16 (citing *Bad Ass Coffee Co. of Hawaii*, 636 F. Supp. 2d at 1247).

[77] *Representative Employment Agreement* at 5; *Amended Complaint* ¶ 57.

[78] *Amended Complaint* ¶ 56.

[79] *Opposition* at 21–22.

[80] 669 P.2d 421 (Utah 1983).

[81] *Id.* at 427.

[82] *Id.*

[83] *Id.*

Here, the non-compete prevents employment only with companies operating in the same narrow industry of inductive charging systems, which consists of only three companies.[84]  As a result, evaluating "[t]he reasonableness of the restraints . . . on a case-by-case basis, taking into account the particular facts and circumstances," the court cannot conclude the restraint is so broad as to be rendered unenforceable here.[85]

### iii.  Employment Scope

Defendants aver the non-compete is too broad because it prevents employment with any WAVE competitor irrespective of the type of employment.[86]  Defendants argue the terms of the non-compete would hypothetically prohibit a WAVE janitor from working for WiTricity, but that is not the situation before the court.  Instead, a court decides whether a non-compete agreement is too broad by applying the particular facts and circumstances.  Defendants have not identified any former employee where the scope of the non-compete is too broad as applied.

### b.  Irreparable Injury

Because WAVE has established a likelihood of success on the merits of its claim for breach of the non-compete provisions, the court next evaluates whether WAVE has demonstrated irreparable injury.

Irreparable injury "is the single most important prerequisite for the issuance of a preliminary injunction."[87]  To establish irreparable injury, WAVE must "demonstrate a

---

[84] Even if the covenant is too broad, Utah law and the contract allowing the court to blue-pencil the provision and enforce it in the revised form. *Representative Employment Agreement* at 7–8.  If this court were to blue-pencil the provision, in its narrowest form it would prohibit WAVE's former employees that had access to confidential information or trade secrets from working for another company in the inductive charging industry with facilities in Utah.  Under such a revision, WiTricity, with its two locations in Utah, would be included. *Amended Complaint* ¶ 2.

[85] *Sys. Concepts*, 669 P.2d at 427.

[86] *Opposition* at 21–22.

[87] *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (quoting *First Western Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017)).

significant risk that [it] will experience harm that cannot be compensated after the fact by monetary damages."[88]  This harm must be "certain, great, actual[,] and not theoretical."[89]  When evaluating the significance of the risk of harm, the court may consider "the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill or competitive market position."[90]

The record before the court demonstrates WAVE will suffer irreparable harm if it cannot enforce its non-compete provisions.  Seventy percent of WAVE's work force departed in the span of three days, leaving WAVE with just five employees and threatening its existence.[91]  This departure was allegedly coordinated by WiTricity, and the former employees began working for WiTricity immediately.[92]  After their departure from WAVE, the former employees had possession of WAVE's confidential information and all gained valuable knowledge about WAVE during their employment.[93]  This information would allow them "to target WAVE's customers and supplies [and] undercut WAVE's prices," which would "destroy WAVE's business relationships, its goodwill, and its market-mover and superior position in the market[.]"[94]  The court finds WAVE has demonstrated that it will suffer harm for which "the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."[95]

---

[88] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

[89] *N.M. Dep't of Game and Fish v. United States Dep't of the Interior*, 854 F.3d 1236, 1251 (10th Cir. 2017) (quoting *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)).

[90] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1264 (10th Cir. 2004).

[91] *TRO Motion* at 1; *Amended Complaint* ¶ 272.

[92] *Amended Complaint* ¶¶ 49, 181; *Opposition* at 12.

[93] *See, e.g.*, Dkt. 48-16, *Declaration of Mitchel Zajac* ¶¶ 7, 10, 11; *Declaration of Steve Ball* ¶ 46; Dkt. 48-9, *Declaration of Gayla Stewart* ¶ 24.

[94] *TRO Motion* at 14.

[95] *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001).

### c.  Balance of Harms

Before granting or withholding injunctive relief, "a court must balance the competing claims of injury and must consider the effect on each party . . . ."[96]  When balancing, the court weighs the irreparable harms of the movant against the harms to the non-movant.[97]  However, "courts afford little weight to self-inflicted harms when conducting the balancing inquiry."[98]

Defendants argue the former employees subject to the non-compete agreement will suffer greater harm than WAVE if the requested injunctive relief is granted.[99]  However, the former employees knowingly signed employment contracts that included a valid non-compete provision and a provision entitling WAVE to seek an injunction or other equitable relief if the non-compete provision was breached.[100]  Without diminishing in any way the real-world impact on Defendants and their families, the court concludes Defendants' harms are self-inflicted. Weighing Defendants' harms against the serious harm WAVE will face absent injunctive relief, the court finds WAVE has met its burden.

### d.  Public Interest

"Although the court recognizes the public has a strong interest in a competitive marketplace, the public has an even greater interest in honoring contractual obligations and in fostering honest competition."[101]  Defendants cite *Crumbl* to argue an injunction would be adverse to the public interest because "the public has a strong interest in free competition in the

---

[96] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987).

[97] *Fish v. Kobach*, 840 F.3d 710, 754 (10th Cir. 2016).

[98] *Equitable Nat'l Life Ins. Co. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1255 (D. Utah 2020) (citing *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002)).

[99] *Opposition* at 24.

[100] *Representative Employment Agreement* at 7.

[101] *ClearOne Commc'ns, Inc. v. Chiang*, 608 F. Supp. 2d 1270, 1281 (D. Utah 2009); *see also MC Oil v. Ultra Res., Inc.*, No. 1:15-cv-0038-DN, 2015 WL 5126268, at *2 (D. Utah Sept. 1, 2015).

economic marketplace."[102]  However, the requested relief in *Crumbl* was an order preventing the competitor franchise from opening new locations.[103]  Here, WAVE requests no relief that would prohibit WiTricity from competing in the market.  Instead, the requested TRO enforces lawful contractual obligations.

Additionally, Defendants argue "[t]he judicial system should not be permitted to be used as an instrument to punish workers and prevent them from obtaining stable long-term employment, especially where, as here, there [sic] former employer was anything but."[104]  In other words, according to Defendants, court enforcement of non-competes is an instrument to punish workers.  However, "[t]he public has a strong interest in the enforcement of valid contracts, including reasonable and enforceable noncompete provisions."[105]  And while the court is mindful of the hardship that may result from enjoining ten Defendants from working for WiTricity, these employees are free to pursue other gainful employment.

## II.  Trade Secret Misappropriation

WAVE sought a TRO that would enjoin WiTricity, Benz, and Scalzi, along with the former employees, from using its confidential and trade secrets information.  Because the language in the stipulated preliminary injunction encompasses trade secrets, the court denies as moot the trade secret misappropriation claim as to the former WAVE employees.  However, this leaves WAVE's requested TRO against WiTricity, Benz, and Scalzi.  The court finds WAVE

---

[102] *Opposition* at 25 (quoting *Crumbl LLC v. Dirty Dough LLC*, No. 2:22-CV-318-HCN-CMR, 2023 WL 5180370, at *10 (D. Utah Aug. 11, 2023)).

[103] *Crumbl LLC v. Dirty Dough LLC*, No. 2:22-CV-318-HCN-CMR, 2023 WL 5180370, at *10 (D. Utah Aug. 11, 2023).

[104] *Opposition* at 25.

[105] *Prop. Mgmt. Bus. Sol. v. Averitte*, No. 2:18-cv-552, 2018 WL 4327922, at *8 (D. Utah Sept. 10, 2018).

does not meet its high burden to demonstrate a likelihood of success on its trade secret misappropriation claim against these Defendants.

WAVE brings its claims for misappropriation of trade secrets under the federal Defend Trade Secrets Act (DTSA) and the Utah Uniform Trade Secrets Act (UTSA).  The elements of a claim for trade secret misappropriation under the DTSA and UTSA closely resemble each other. To establish a claim under the DTSA, a plaintiff must show: "(1) the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means."[106]

WAVE has not provided any evidence that WiTricity, Benz, or Scalzi have acquired, used, or disclosed WAVE's trade secrets.  WAVE avers "the WiTricity Defendants, as the leaders of this coordinated effort, were aware, or should have been aware, that the Conspiring Employees' acquisition, use, or disclosure of WAVE's confidential and trade secret information was improper[.]"[107]  However, noticeably absent from this argument is any evidence that WiTricity, Benz, or Scalzi themselves acquired, used, or disclosed WAVE's trade secrets. Instead, WAVE relies on something akin to civil conspiracy, where the circumstantial evidence suggests the former employees acquired WAVE's trade secrets at WiTricity's direction and for the purpose of aiding WiTricity.  And therefore, the former employees' possession is imputed to WiTricity, Benz, or Scalzi.  However, WAVE does not lay out the elements of a civil conspiracy claim and identify supporting evidence, let alone satisfy the high burden to demonstrate a likelihood of success on the merits.

---

[106] *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1302 (D. Utah 2020).

[107] *TRO Motion* at 16.

### III.    Bond

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined or restrained."[108]   Under this rule, courts have "wide discretion" in determining the appropriate level of security necessary to compensate a wrongfully enjoined party.[109]

WAVE argues the court should not require any security because the former employees' contracts stated WAVE was "entitled to an injunction . . . []without posting a bond or other security[]."[110]   In their brief Defendants made no argument as to the appropriate bond amount, but at oral argument Defendants requested a bond in excess of $1,000,000, ostensibly representing the cumulative one-year salary of each of the ten enjoined individuals.   Because Defendants have not put forth an evidentiary basis for their request, and because WAVE has not had the opportunity to respond, the court concludes a $10,000 bond, payable to the Court of Clerk's office, is appropriate at this time.   This amount may be subject to modification upon an successful motion to reconsider.

### CONCLUSION

The parties have stipulated to the entry of a preliminary injunction against Aguilar, Ball, Eisert, Gaddam, Gomez, Harding, Harmsen, Nordlund, Peppelaar, Staples, Stewart, and Zaheer, prohibiting them from using or disclosing WAVE's confidential information, as defined in the

---

[108] Fed. R. Civ. P. 65(c).

[109] *RoDa Drilling Co.*, 552 F.3d at 1214 (quoting *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)).

[110] *Representative Employment Agreement* at 7; *TRO Motion* at 23.

confidentiality provision of their WAVE employment contracts, and requiring the return of any such information in their possession.[111]

Because the stipulated preliminary injunction grants WAVE all its requested relief, the court denies as moot the same relief sought by WAVE based on its trade secret misappropriation claim as to the former WAVE employees.  The court DENIES IN PART WAVE's Motion, denying its request for a TRO enjoining WiTricity, Benz, and Scalzi because WAVE has not shown a likelihood of success on the merits of a trade secret misappropriation claim against them.

The court GRANTS IN PART the requested TRO and enjoins Ball, Eisert, Espinosa, Gaddam, Gomez, Harmsen, Peppelaar, Staples, Stewart, and Zaheer from working for WiTricity for one year consistent with the non-compete provisions of their WAVE employment contracts.

The court issues the following Order:

1. WAVE's Motion[112] is GRANTED IN PART as delineated below.

2. Defendants Ball, Eisert, Gaddam, Harmsen, Peppelaar, Staples, Stewart, Zaheer, Gomez, Nordlund, Aguilar, and Harding are:

   a. PROHIBITED from using or disclosing WAVE's confidential information, as defined in the confidentiality provision; and

   b. REQUIRED to return all of WAVE's confidential information in their possession, custody, and control to their counsel or WAVE within 48 hours.

   c. "Confidential Information includes, but is not limited to, formulas, patterns, compilations, programs, devices, methods, techniques, or processes, business

---

[111] *Minute Entry*.

[112] Dkt. 4.

      plans and strategies, customer lists, customer data, information regarding

      employees and other service providers, marketing plans, supplier and vendor lists

      and cost information, software and computer programs, data processing systems

      and information contained therein, price lists and pricing strategies, financial data,

      and any other trade secrets or confidential and proprietary information,

      documents, reports, plans, or data, of or about [WAVE]."[113]

3. Defendants Ball, Eisert, Espinosa, Gaddam, Gomez, Harmsen, Peppelaar, Staples, Stewart, and Zaheer are ENJOINED from working for WiTricity for one year following their last day of employment at WAVE consistent with the non-compete provisions of their WAVE employment contracts.

4. This Order will expire fourteen (14) days from Monday, August 26, and will renew every fourteen days, unless or until modified by the court based on a material change of circumstances or further order of the court following a preliminary injunction hearing.

5. WAVE is ORDERED to post bond within 48 hours in the amount of $10,000, payable to the Clerk of Court.

      SO ORDERED this 26th day of August, 2024, at 4:30 p.m., in Salt Lake City, Utah.

                        BY THE COURT:

                        _____

                        ROBERT J. SHELBY
                        United States Chief District Judge

---

[113] *Representative Employment Agreement* at 3.